UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BOARD OF EDUCATION OF THE WEST
HEMPSTEAD UNION FREE SCHOOL
DISTRICT,

**COMPLAINT**

Plaintiffs,

-against-

Civil Action No. _____

SZ and AS, on behalf of AS,

Defendants.

-------------------------------------------------------------X

      Plaintiff, BOARD OF EDUCATION OF THE WEST HEMPSTEAD UNION FREE

SCHOOL DISTRICT ("Plaintiff"), as and for its Complaint against Defendants S.Z. and A.S., on

behalf of A.S., alleges as follows:

## NATURE OF THE ACTION

     1.     This is an action brought pursuant to the Individuals with Disabilities Education

Act ("IDEA"), 20 U.S.C. § 1400 et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.

§ 794, and 42 U.S.C. § 1983. The Individuals with Disabilities Education Act, 20 U.S.C. § 1400,

et seq. (IDEA) is ambitious legislation enacted in response to Congress' perception that a majority

of children with disabilities in the United States "were either totally excluded from schools or were

sitting idly in regular classrooms awaiting the time when they were old enough to drop out." See,

Endrew F. v. Douglas Cnty. Sch. Dist., 580 U.S. 386, 400 (2017). IDEA therefore requires

provision of a free appropriate public education (FAPE), an educational program "reasonably

calculated to enable a child to make progress appropriate in light of the child's circumstances. Id.

at 403.

     2.     The IDEA, "guarantees a substantively adequate program of education to all

eligible children" (Endrew F. v. Douglas Cnty. School Dist., 137 S.Ct. at 994, quoting, Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 200-202 [1982]), and with that, "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. v. Douglas Cnty. School Dist., 137 S.Ct. at 999-1001.

    3.     There is no bright-line rule for determining what "appropriate progress" means. Rather, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." Endrew F. v. Douglas Cnty. School Dist., 137 S. Ct. at 1001; see also, S.C. v. Katonah-Lewisboro Cent. Sch. Dist., 175 F.Supp.3d at 250. The IDEA requires participating States to educate a wide spectrum of handicapped children, and the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between. See, Endrew F. v. Douglas Cnty. School Dist., 137 S.Ct. at 999, citing Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. at 202. "For children receiving instruction in the regular classroom, this would generally require an IEP reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." Endrew F. v. Douglas Cnty. School Dist., 137 S.Ct. at 996. Equally so, it typically means "providing a level of instruction reasonably calculated to permit advancement through the general curriculum". Endrew F. v. Douglas Cnty. School Dist., 137 S.Ct. at 1000. The IDEA ensures an appropriate education, not one providing everything thought desirable by parents. Walczak v. Florida UFSD, 142 F.3d 119, 132 (2d Cir. 1998); Rowley, 458 U.S. at 189, 199 (school districts not required to "maximize" potential of students with disabilities); Grim, 346 F.3d 379 (2d Cir., 2003).

    4.     Plaintiff is the West Hempstead Union Free School District and the public school

district responsible for the provision of a FAPE to A.S., a minor child who is classified as eligible to receive special education pursuant to 20 U.S.C. §§ 1401(3), 1414(b)(4) and who, at all times relevant herein, has resided with his parents, S.Z. and A.S., within the geographic boundaries of the District.

5.      In an administrative proceeding held before Impartial Hearing Officer Linda Agoston, Esq., Plaintiff Board of Education presented evidence of its compliance with the IDEA and consequently, the provision of a FAPE to AS during the afore-mentioned 2022-2023 school year.

6.      The proceeding before IHO Agoston concluded, after thirteen days of testimony, with a decision, dated October 7, 2024, in favor of Defendants on several issues, first, that Plaintiff denied defendants a FAPE for the 2022-2023 school year, second, that the parent-elected non-public school placement at the Elijah School during the 2022-2023 school year was appropriate under the IDEA, and third, that equitable considerations supported reimbursement of the costs attendant to A.S.'s attendance at the Elijah School to the Defendants. The IHO's decision is attached as Exhibit 1.

7.      Plaintiff appealed the IHO's decision to the New York State Department of Education, Office of State Review (SRO). See 20 U.S.C. § 1415(g); N.Y. Education Law § 4404(2).

8.      On January 6, 2025, SRO Sarah L. Harrington rendered her decision, attached as Exhibit 2. The SRO affirmed the IHO's ruling in all respects under the IDEA.

9.      For the reasons stated below, Plaintiff is aggrieved by the decision of the Office of State Review.

## JURISDICTION AND VENUE

10.     Jurisdiction is based upon 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, and 28 U.S.C. § 1343(a) in that the claims are asserted under laws providing for the protection of civil rights. The cause of action is provided by 20 U.S.C. §1415(i)(3). The Court has supplemental jurisdiction to adjudicate New York state law claims arising out of the same facts as in the asserted federal claims. 28 U.S.C. § 1367.

11.     Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b) because Plaintiff is an educational-municipal corporation existing under the laws of the State of New York and maintains its principal offices within the geographic boundaries of the Eastern District of New York. Further, Defendants reside within this judicial district and the claims arose within this judicial district.

12.     Plaintiff has exhausted its administrative remedies for all claims that require exhaustion.

13.     This appeal is timely filed within 120 days of receipt of the SRO's decision as required by 20 U.S.C. § 1415(i)(2)(B).

## THE PARTIES

14.     A.S. is a minor child and a student. He is a "child with a disability" within the meaning of 20 U.S.C. § 1401(3)(A), 34 C.F.R. § 300.8(a) and an individual with a disability as defined by 34 C.F.R. § 104.3(j) and 28 C.F.R. § 35.104.

15.     S.Z. and A.S. are A.S.'s parents as defined by 20 U.S.C. § 1401(23), 34 C.F.R. § 300.30(a).

16.     Defendants reside within Nassau County, New York, and have resided there at all relevant times herein.

17.     Based on established practice within the Second Circuit, Defendants are named in this Complaint by their initials.

18.     Plaintiff West Hempstead Union Free School District is a municipal corporation created pursuant to Article 51 of the New York State Education Law and a Local Educational Agency (LEA) as defined in 20 U.S.C. § 1401(19), 34 C.F.R. § 300.28(a), a recipient of federal financial assistance as defined in 34 C.F.R. § 104.3(h), and a public entity as defined at 28 C.F.R. § 35.104. Plaintiff maintains its principal place of business within Nassau County, New York.

## STANDARD OF REVIEW

19.     Federal courts do not give unfettered deference to SRO decisions. The court must determine whether the SRO's conclusions were grounded in a thorough and careful analysis. If the court determines that the SRO's conclusions were not supported by a preponderance of the objective evidence, no deference is warranted. M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 248 (2d Cir. 2012).

## FACTUAL ALLEGATIONS

20.     There should be no dispute A.S. made meaningful and consistent progress throughout the 2021-2022 school year, making significant progress in light of his disability within the District's recommended program at BOCES CRC and would have continued to make progress in the District's recommended 8-1-2 program during the 2022-2023 school year if A.S. remained enrolled in the District. We urge the record is clear and moreover, devoid of any proof to the contrary. (Dist. Ex. 1-6, 24-26, 28, 31, 36, 39-44, 47-54, 76-78). The only reasonable conclusion must be that the District offered A.S. an appropriate educational program for the 2022-2023 school year. (Dist. Ex. 1-6).

21.     Marissa O'Brien, a school psychologist for West Hempstead, first encountered A.S.

as a CPSE transfer student in and around March 2021. (Tr. 11-12, 14-16, 18-19, 21-24, 26-27). In

and around April 2021, the CPSE and Committee on Special Education ("CSE") met to transition

A.S. to Kindergarten under the CSE, as well as develop his special education program for the

following school year, *i.e.*, the 2021-2022 school year. (Tr. 31-34, 40-; Dist. Ex. 1, 1a).

22.     By way of background, in his pre-school setting, A.S. displayed a good amount of

receptive language and responded to simple direction. (Tr. 34-36; Dist. Ex. 1). He did, however,

display some aggressive and self-injurious behaviors which required support. (Tr. 37-38, 44-45).

In addition, A.S. had social-development needs – he was not really interested in his peers – and

possessed gross and fine motor weaknesses that needed to be addressed. (Tr. 44-45; Dist. Ex. 1,

1a). At the April CPSE meeting, the Committee reviewed his current functioning at his then

placement at HASC, and determined that the significant level of need he had in multiple areas

required a recommendation of extended school year services at frequencies that were the same as

during the school year and hence, no reduction. (Tr. 41-48, 49-52, 62-64; Dist. Ex. 1a). The CPSE

then referred A.S. for special education for his kindergarten school year (2021-2022), and the

CPSE to CSE transition meeting was held at that time. (Tr. 52-53, 65-66; Dist. Ex. 1, 1a).

23.     During the transition-CSE meeting, A.S. was classified under Autism. (Dist. Ex. 1,

1a). The CSE reviewed the present levels of performance and developed appropriate goals, related

services, and accommodations for A.S. based on the needs and areas of weakness identified by the

CSE. (Tr. 65-69, 70-71, 76-77, 80-81; Dist. Ex. 1 at 1, 7-8). The CSE then turned to a discussion

of placement for A.S.'s kindergarten year, looking at his needs and the services he required. (Tr.

72-73; Dist. Ex. 1). A.S. was in a 6-1-2 at HASC at that time. (Tr. 73). The CSE first considered

less restrictive settings, including an 8-1-2 class within the District, but ultimately, considering the

frequency and intensity at that time of A.S.'s self-injurious and aggressive behaviors, the CSE

concluded that he needed a classroom with more support than what the District's 8-1-2 program could provide. (Tr. 73-74; Dist. Ex. 1 at 1-2). The CSE recommended A.S. be placed in a 6-1-2 classroom program, that could provide the needed support, recommended related services, as well as provide A.S. with the Applied Behavioral Analysis ("ABA") methodology he needed. (Tr. 74-76, 79-80; Dist. Ex. 1). The CSE explained to the Parents that applications to different programs would be sent out by the District on A.S.'s behalf, and once he was accepted at one or more, the CSE would convene to discuss the placements and recommend the most appropriate one. (Tr. 75-76, 82-84, 85-86). Lastly, the CSE agreed that due to his behaviors, once he was placed in a particular program, a Functional Behavioral Assessment ("FBA") would be conducted to address AS's behaviors. (Tr. 78; Dist. Ex. 1).

24.     The CSE subsequently reviewed and accepted BOCES Children's Readiness Center ("BOCES CRC") at a meeting that occurred in August 2021. (Tr. 84-86, 88-90, 94-95, 102-03; Dist. Ex. 2). During the meeting, BOCES CRC recommended some changes to A.S.'s related services as set forth in his IEP, in particular an increase for speech therapy services and a slight decrease for occupational therapy services; those changes were incorporated into his IEP. (Tr. 96-97; Dist. Ex. 2 at 9). BOCES CRC also recommended that he have a 1-1 aide for the school year due to the significance of his behaviors and his noted Pica. (Tr. 97-98, 106-07, 522-23; Dist. Ex. 2 at 1; Dist. Ex. 3 at 9). Lastly, the CSE discussed providing AS with an assistive technology device ("AAC device"), a tool that AS used at his prior placement; speech consultation was added to ensure that both the student and Parent could use the device successfully. (Tr. 99-100; Dist. Ex. 2 at 9). The Committee, Parent included, was in agreement with A.S. attending BOCES CRC for his kindergarten school year (2021-2022) and with the CSE's recommendations as set forth in his IEP. (Tr. 100-01, 104-07; Dist. Ex. 2, 3).

25.     Shortly after the start of the year, however, in November 2021, an advocate contacted PPS Director Bridget Karis on behalf of the Parent, expressing concerns regarding quarantining rules at BOCES CRC as well as occupational therapy concerns. (Tr. 166, 168, 173-74, 181). In response, a CSE meeting was scheduled to allow the whole team to meet to discuss the Parent's concerns, as well as A.S.'s transition to BOCES CRC and his current progress. (Tr. 182, 184, 193, 197-98; Dist. Ex. 4). The CSE convened on November 15, 2021. (Dist. Ex. 4). The staff provided an update on A.S.'s functioning, specifically his transition to BOCES CRC, and how he was functioning in the program to that point. (Tr. 189-91, 194-95; Dist. Ex. 4). The staff at BOCES reported that A.S. was transitioning well into the new program and making incremental progress at that point 3 months into the school year and benefitting from the structure and routine the program provided. (Tr 201; Dist. Ex. 4). After reviewing his progress and based on the new and updated information from BOCES staff, the CSE reviewed and updated A.S.'s IEP goals accordingly. (Tr. 195-97; Dist. Ex. 4 at 10-17).

26.     The Parent expressed her concerns to the Committee as well. (Tr. 191-92). The Parent first raised a concern regarding the number of times (2x) A.S. had been quarantined that year due to exposure to COVID-19; the CSE explained that unfortunately, all NYS schools had to abide by certain rules and regulations due to the pandemic, and neither the CSE nor BOCES had control over whether and how A.S. had to quarantine, though consideration was given to any impact it may have had on his progress. (Tr. 191-92; Dist. Ex. 4 at 1). Ms. Singh shared that when he – or any other student – was required to quarantine, she would provide academic work to be completed at home (Tr. 520-21). The Parent also raised a concern with respect to sensory needs and occupational therapy. (Tr. 191-92, 198-99; Dist. Ex. 4 at 1-2). More specifically, the CSE discussed A.S.'s sensory needs as it related to his behaviors. (Tr. 198-99). The CSE determined

that they would increase sensory items to help with his behaviors, in conjunction with implementation of his behavior intervention plan ("BIP"). (Tr. 198-99; Dist. Ex 4). However, the CSE declined to increase OT services within the school setting as requested by the Parent, as the CSE felt the level of OT was appropriate at that time and meeting his needs. (Tr. 198-99, 243-44; Dist. Ex. 4). The CSE did recommend an increase in home OT services, as many of the Parent's OT-related concerns were occurring within the home setting, rather than at school. (Tr. 198-99, 243-44; Dist. Ex. 4). In addition, the CSE recommended that A.S. receive behavior intervention services at home, and that the Parent receive parent training and counseling in the home, all to address behavioral concerns arising at home. (Tr. 198-99, 244; Dist. Ex. 4 at 18).

27.    Lastly, the CSE reviewed an updated FBA that had been conducted by BOCES CRC staff which had been recommended at an earlier CSE meeting. (Tr. 184, 200; Dist. Ex. 4, 30). The FBA targeted behaviors including aggression and self-injurious behaviors. (Tr. 200; Dist. Ex. 4 at 8; Dist. Ex. 30, 31). The FBA revealed that A.S. engaged in these behaviors primarily when he was denied access to a preferred item or needed to transition; a BIP was thereafter developed. (Tr. 200; Dist. Ex. 30). The CSE also discussed that A.S. was due for his three-year re-evaluation, but the Parent was in agreement with the CSE to wait a bit longer to begin testing. (Tr. 202-03, 222). Evaluation results are, generally, more accurate when students have a level of familiarity with the evaluator and the CSE recommended waiting a little longer to evaluate A.S. to further build rapport with him and BOCES CRC staff. (Tr. 202-03, 222). Overall, the Parent was in agreement with the CSE's recommendations. (Tr. 202, 223, 224-25; Dist. Ex. 4).

28.    As noted, Ms. Singh was A.S.'s classroom teacher for the 2021-2022 kindergarten school year and she actively participated in the November 2021 CSE meeting. (Tr. 520). In preparation for the 2021-2022 school year, Ms. Singh reviewed A.S.'s IEP, his education records

from the prior school year, and spoke with his parents regarding academic progress and goals (Tr. 521-22). Ms. Singh also spoke with her support teacher and a Nassau BOCES psychologist to review A.S.'s goals, as well as his behavioral history (Tr. 522-23). Ms. Singh stated that while at CRC, one individual was always assigned to A.S. during each work session, so as to prevent self-injurious behaviors and aggression, for which A.S. required "one-to-one" support (Id). Ms. Singh and her staff worked to develop a plan to address A.S.'s behavioral issues, including a BIP, while maintaining progress toward meeting his IEP goals. (Tr. 524, 527-31). Specifically, Ms. Singh communicated with a Nassau BOCES psychologist to develop A.S.'s BIP. (Tr. 525). Looking to the plan, Ms. Singh stated that each 30-minute work session would begin with a five minute "mandate session" where A.S. would select, for example, "putty, edibles like jellybeans, gummies, [or] sensory toys" that A.S. would work towards and earn to reinforce positive behaviors (Tr. 526-27).

29.    Ms. Singh noted that A.S.'s academic progress up to this point (November 2021), utilizing the existing IEP and BIP, was "gradual, steady but gradual"; according to Singh, "[t]here was no goal that he did not make progress on". (Tr. 539, 542, 552-55). Ms. Singh explained that A.S. consistently required "repetition" to learn a new skill and "redirect[ion]" to address certain behaviors. (Tr. 540). Ms. Singh stated that from September through mid-November 2021, she and her aides collected data on A.S.'s academic and behavioral progress (Tr. 540-41). Ms. Singh noted that after any "break" or quarantine, she and her staff "would see an increase in behaviors," which was "normal" for A.S., and they would adjust his demands accordingly. (Tr. 541-42). Ms. Singh expressed her opinion that the behavior plan developed for A.S. was "very appropriate" for him (id). Ms. Singh explained that every day, A.S. would be sent home with a folder where, on it, she would write what A.S. worked on that day and a note to his parents to update them on his academic

and behavioral progress (Id). Ms. Singh also shared that, "every Friday, she would meet with Ms. Stein, give her data for that week" and provide an update to A.S.'s parents on his behavior (Id). Ms. Singh also shared that if his parents ever had any questions, they would "set up a phone call" to discuss. (Tr. 551). Ms. Singh recalled that A.S.'s mother also visited the classroom on several occasions to observe. (Id). Ms. Singh then reviewed A.S.'s educational update for the classroom, which summarized his overall progress for the last three years (Tr. 552-53). Ms. Singh stated that A.S. benefitted from the "structure and routine" of the school day, and he continued to make gradual academic gains with the assistance of the BIP. (Id).

30.     Following the November 2021 CSE meeting and throughout the remainder of the 2021- 2022 school year, the District ensured A.S. was receiving his services both in school and at home. (Tr. 227-30, 238-39, 243). To the extent there was a gap in services, those services were made up. (Tr. 230). Additionally, it was during this time, the period from November 2021 through June 2022, that the Parent raised additional concerns with Ms. Karis. (Tr. 230-31). At one point, the Parent once again raised concerns about A.S. having to quarantine and its impact on his learning. (Tr. 231-33). Ms. Karis reiterated that unfortunately, all schools had to follow the State's COVID- 19 protocols and quarantine requirements, but that the District would address any noticeable impact it might have on AS. (Tr. 232-33).

31.     CRC began A.S.'s re-evaluation in and around February 2022. (Dist. Ex. 33-39). It was also in and around that time that the Parent requested a neuropsychological evaluation be conducted to gather more in-depth information. (Tr. 233-35, 239-41; Dist. Ex. 32). Recognizing the value of the information such an evaluation may yield, the District facilitated this evaluation, ensuring it was not also testing areas that BOCES was testing as part of the re-evaluation. (Tr. 234-35, 239-40; Dist. Ex. 32). Unfortunately, the parents would not provide the report of that

independent evaluation until months later in or around September 2022 (Tr. 235). The Parent also once again raised concerns regarding A.S.'s sensory needs; the Parent was reminded that additional OT services were recommended in the home to address these needs and concerns. (Tr. 236). Lastly, during the period prior to A.S.'s annual review that year, the Parent raised concerns to Ms. Karis about not feeling as if she was being heard by BOCES CRC. (Tr. 237-38). Much of this concern stemmed from the difference of opinion regarding sensory input items such as use of a weighted vest. (Id). BOCES CRC staff did not see a noticeable difference in A.S.'s attention or behavior while wearing a weighted vest, but the Parent did see a difference at home and wanted more sensory input throughout A.S.'s day. (Id). BOCES expressed to the Parent that more sensory input would be incorporated in A.S.'s day through his BIP. (Id). Despite addressing the Parent's concerns, the Parent still questioned to Ms. Karis whether BOCES was an appropriate placement for A.S. (Tr. 238). Ms. Karis spoke to the Parent and expressed that once the re-evaluation results are reviewed as well as the neuropsychological evaluation, the CSE could discuss in greater detail whether BOCES CRC continued to be the most appropriate placement for A.S. (Tr. 238). In the intervening time, in or around January 2022, a BCBA would be placed in the home and OT services in the home would be implemented. (Tr. 239, 243-45).

32.   On June 17, 2022, the CSE convened to review the outcomes of BOCES' reevaluation testing, hear from independent evaluator Bonnie Taylor, and develop a program for A.S.'s 2022- 2023 school year. (Tr. 248-49; Dist. Ex. 5, 15, 33-44). During that meeting, the CSE listened to verbal reports from the various teachers, providers and evaluators, as well as the parent and Dr. Taylor. (Tr. 249-; Dist. Ex. 5). For her part, Ms. Singh reported that A.S. made gradual progress on his IEP goals during 2021-2022 and made "gains" during the school year (Tr. 562-64). Ms. Singh expressed her opinion that, for the 2021-2022 school year, both the behavior plan

12

and the 6-1-2 program at CRC were effective in assisting A.S. make progress academically, behaviorally and socially (Tr. 567-68). Specifically, Ms. Singh stated that although A.S. was receiving one-to-one support, he still had opportunities to engage with his peers for group activities (Id). Ms. Singh expressed her opinion that the 6-1-2 program at CRC was appropriate for AS. (Tr. 568).

33.     Ms. Stein described the psychological evaluation she performed on AS on February 15, 2022 (Tr. 663-71). As part of the psychological evaluation, Ms. Stein also requested Ms. Singh and A.S.'s mother complete a questionnaire. (Tr. 670). In sum, Ms. Stein stated that, over the last three years, A.S. made slow but steady gains toward his overall development and was doing well with an individualized instruction program that focuses on communication, socialization, academics, activities of daily living skills and behavior. (Tr. 671, 676).

34.     For her part, Dr. Taylor shared that it was very difficult to test A.S., that his attention was fleeting, and it was very hard to engage A.S. (Tr. 258). She noted she was unable to administer a particular assessment as a result of A.S.'s behavior (Tr. 258); the District would further note Dr. Taylor readministered the Stanford-Binet assessment, which had already been conducted by BOCES and hence the results were of questionable validity. (Tr. 259). The CSE listened and considered Dr. Taylor's input and recommendations. (Tr. 259). For its part, BOCES shared, after having worked with AS for the school year, that AS had made incremental progress in all areas throughout the school year. (Tr. 257, 260). Following its review of all information shared by the various participants, A.S.'s present levels of performance were updated, new goals were crafted and/or earlier goals updated to address his identified needs, and a program developed for the 2022- 2023 school year. (Dist. Ex 5, 15).

35.     With all of the information available to it at that time, the CSE agreed to submit

screening packets to canvass whether there were other, additional appropriate educational programs for A.S. (Tr. 261). At no point did the CSE agree or concede any belief that A.S.'s program at BOCES CRC was inappropriate. (Tr. 262). In fact, as noted, it was the belief of the CSE and BOCES staff that they were meeting A.S.'s needs and he was making progress in their program. (Tr. 262-63). Given the timing of the meeting in June and the belief the current program was meeting A.S.'s needs, the CSE continued to recommend A.S. receive ESY in the BOCES CRC during the 2022 summer while they canvased other, appropriate programs for the Fall. (Tr. 261, 264). Unlike what would be typical, ie. a reduction in services during the summer to address regression, the CSE recommended A.S. receive the same level of service during ESY that he was receiving during the 10-month school year, including a 1:1 aide to provide support. (Tr. 264-67; Dist. Ex. 5).

36.     In closing, the CSE recommended screening packets for the 10-month school year beginning in September (Dist. Ex. 55-63), and for the summer, placement in the 6-1-2 program with related services as outlined on the IEP; any reduction attendant to the services offered in the summer during the day, i.e., OT, PT, speech, would be implemented instead in the home along with BIS. (Tr. 268-71; Dist. Ex. 5, 15). Parenthetically, behavioral services were increased from 5 hours per week to 10, and parent counseling and training remained steady at 2 hours per week. (Tr. 268; Dist. Ex. 5, 15). Notwithstanding A.S.'s progress, all of the discussion, the review of the various reports and assessments, and the voluminous information made available, the parents noted their disagreement with the CSE's recommendation and their intention to enroll the student in the Elijah School in July. (Tr. 267; see also, Dist. Ex. 75).

37.     After various attempts with the parents to schedule a CSE meeting over the summer to review the results of the screening efforts and develop a 10-month program for 2022-2023 (Dist.

Ex. 69), the CSE convened on September 7, 2022. (Tr. 273-76; Dist. Ex. 6, 16). At the September meeting, the CSE reviewed the outcome of their screening efforts, the parents' concerns as expressed in their 10-day notice, the student's absence from the District's ESY program in favor of the Elijah School (Dist. Ex. 75), and reviewed A.S.'s progress again with BOCES CRC as well as an update from Elijah. (Tr. 277-280; Dist. Ex. 6, 16, 55-63). Given the unavailability of any outside program for the student, the CSE reviewed in-District options for the student, including its 8-1-2 program. (Tr. 281; Dist. Ex. 55-63). Given the student's gainful performance during the 2021-2022 school year, the CSE looked again at its own 8-1-2 program. (Tr. 281-82; Dist. Ex. 6, 16). Noting A.S.'s progress during the 2021-2022 school year and a reduced need for support, as well as BOCES' representation that with a strong behavioral plan and variety of supports, A.S. could be successful, the CSE went on to discuss the make-up of in-District programming for A.S. (Tr. 283-284).

38.    As the special education teacher explained, during the 2022-2023 school year, the 8-1-2 program was under-enrolled so there would only be 4 students and A.S. would have his own 1:1 aide (Tr. 284-285). The program was also language-rich with the speech-language pathologist and psychologist working very closely with the program. (Tr. 285). Further, the profile of children in the class was aligned with A.S., particularly in terms of behavior and communication. (Tr. 285). Finally, the program would be implementing ABA methodology and discreet trial training. (Tr. 285, 288-89). In addition to the 8-1-2 program, A.S. would receive 10 hours per week of BIS in the home, parent counseling and training, Speech, OT, PT, an updated FBA and BIP, consultation with a BCBA, amongst other services and accommodations. (Tr. 286-87, 291-93; Dist. Ex. 6, 16).

39.    Ultimately, while the majority of the CSE agreed with the recommended 8-1-2 program and believed it would meet A.S.'s unique needs, the parents, Elijah and Dr. Taylor did

not; the Parents therefore opted to continue the student's placement at Elijah for the reminder 2022-2023; never did they give the CSE's recommended program an opportunity. (Tr. 286-95).

COUNT I

**THE STATE REVIEW OFFICER ERRONEOUSLY AFFIRMED THE FINDINGS AND DETERMINATION OF THE IMPARTIAL HEARING OFFICER IN CONCLUDING PLAINTIFF DID NOT PROVIDE A.S. WITH A FAPE DURING THE 2022-2023 SCHOOL YEAR**

40. Plaintiff reasserts and realleges each and every allegation set forth in paragraphs "1" through "39" above as if more fully set forth herein.

> **A. The SRO's Determination That Plaintiff Did Not Appeal Several Of The District's Findings Is Not Thorough And Well-Reasoned And Otherwise Represents Clear Error And Must Be Vacated.**

41. Contrary to the SRO's determination (SRO Dec. 13-15), the District's pleadings were reasonably specific and set forth (1) the specific relief sought in the underlying action or proceeding, (2) a clear and concise statement of the issues presented for review and the grounds for reversal or modification to be advanced, with each issue numbered and set forth separately, and identifying the precise rulings, failures to rule, or refusals to rule presented for review; and (3) citations to the record on appeal, along with the identification of the relevant page number(s) in the hearing decision, hearing transcript, exhibit number or letter. See e.g., 8 NYCRR 279.8(c).

42. Furthermore, the memorandum of law properly included a table of contents together with (1) a concise statement of the case, setting out the facts relevant to the issues submitted for review; and (2) a statement of the party's arguments, including the party's contentions regarding the decision of the impartial hearing officer and the reasons for them, with each contention set forth separately under an appropriate heading, supported by citations to appropriate legal authority and to the record on appeal.

43. Thus, the SRO's determination limiting the scope of the appeal was palpably

16

unreasonable, arbitrary and capricious and holding the District to only those issues which the SRO in its sole discretion determined to be "explicitly raised" represents clear error and must be vacated and reversed. (SRO Dec. 15).

### B. The SRO's Determination Affirming The IHO's Determination That The June 2022 IEP Developed For The Student For The 2022-2023 School Year Was Untimely, Inappropriate And Deprived A.S. of A FAPE Is Not Thorough And Well-Reasoned And Otherwise Represents Clear Error And Must Be Vacated.

44.     The CSE convened on June 17, 2022, to review the outcomes of BOCES' reevaluation testing, hear from independent evaluator Bonnie Taylor, and develop a program for A.S.'s 2022- 2023 school year. (Tr. 248-49; Dist. Ex. 5, 15, 33-44). During that meeting, the CSE listened to verbal reports from A.S.'s various teachers, providers and evaluators, as well as the parent and Dr. Taylor. (Tr. 249-; Dist. Ex. 5). Following its review of all information shared, A.S.'s present levels of performance were updated, new goals were crafted and/or earlier goals updated to address his identified needs, and a program developed for the 2022- 2023 school year. (Dist. Ex 5, 15). The CSE also agreed to submit screening packets to canvass whether there were other, additional appropriate educational programs for A.S. (Tr. 261). At no point did the CSE agree or concede any belief that A.S.'s program at BOCES CRC was inappropriate. (Tr. 262). In fact, as noted, it was the belief of the CSE and BOCES staff that they were meeting A.S.'s needs and he was making progress in their program. (Tr. 262-63).

45.     Given the timing of the meeting in June and the belief the current program was meeting A.S.'s needs, the CSE continued to recommend A.S. receive ESY in the BOCES CRC during the 2022 summer while they canvased other, appropriate programs for the Fall. (Tr. 261, 264). Unlike what would be typical, i.e., a reduction in services during the summer to address regression, the CSE recommended A.S. receive the same level of service during ESY that he was receiving during the 10-month school year, including a 1:1 aide to provide support. (Tr. 264-67;

Dist. Ex. 5).

46.     In closing, the CSE recommended screening packets for the 10-month school year beginning in September (Dist. Ex. 55-63), and for the summer, placement in the 6-1-2 program with related services as outlined on the IEP; any reduction attendant to the services offered in the summer during the day, i.e., OT, PT, speech, would be implemented instead in the home along with BIS. (Tr. 268-71; Dist. Ex. 5, 15). Parenthetically, behavioral services were increased from 5 hours per week to 10, and parent counseling and training remained steady at 2 hours per week. (Tr. 268; Dist. Ex. 5, 15).

47.     Notwithstanding A.S.'s progress, all of the discussion, the review of the various reports and assessments, and the voluminous information made available, the parents noted their disagreement with the CSE's recommendation and their intention to enroll the student in the Elijah School in July. (Tr. 267; see also, Dist. Ex. 75).

48.     The District made available to A.S. a summer ESY program calculated to meet the student's needs while it investigated, in earnest, other placements for A.S. in September for the 2022-2023 10-month school year. The SRO's determination that a failure to include a program in A.S.'s June 2022 IEP for the 2022-2023 10-month school year deprived A.S. of a FAPE, when viewed under the totality of circumstances presented represents clear error and must be vacated and reversed.

> **C.   The SRO's Determination Affirming The IHO's Determination That The September 2022 IEP Developed For The Student For The 2022-2023 School Year Was Untimely, Inappropriate And Deprived A.S. of A FAPE Is Not Thorough And Well-Reasoned And Otherwise Represents Clear Error And Must Be Vacated.**

49.     The District attempted in earnest to schedule a CSE meeting with the Parents during the 2022 Summer, unfortunately to no avail. After various attempts with the parents to schedule a

CSE meeting over the summer to review the results of the screening efforts and develop a 10-month program for 2022-2023 (Dist. Ex. 69), the CSE convened on September 7, 2022. (Tr. 273-76; Dist. Ex. 6, 16). At the September meeting, the CSE reviewed the outcome of their screening efforts, the parents' concerns as expressed in their 10-day notice, the student's absence from the District's ESY program in favor of the Elijah School (Dist. Ex. 75), and reviewed A.S.'s progress again with BOCES CRC as well as an update from Elijah. (Tr. 277-280; Dist. Ex. 6, 16, 55-63).

50.     Given the unavailability of any outside program for the student, the CSE reviewed in-District options for the student, including its 8-1-2 program. (Tr. 281; Dist. Ex. 55-63). Given the student's gainful performance during the 2021-2022 school year, the CSE looked again at its own 8-1-2 program. (Tr. 281-82; Dist. Ex. 6, 16). Noting A.S.'s progress during the 2021-2022 school year and a reduced need for support, as well as BOCES' representation that with a strong behavioral plan and variety of supports, A.S. could be successful, the CSE went on to discuss the make-up of in-District programming for A.S. (Tr. 283-284).

51.     As the special education teacher explained, during the 2022-2023 school year, the 8-1-2 program was under-enrolled so there would only be 4 students and A.S. would have his own 1:1 aide (Tr. 284-285). The program was also language-rich with the speech-language pathologist and psychologist working very closely with the program. (Tr. 285). Further, the profile of children in the class was aligned with A.S., particularly in terms of behavior and communication. (Tr. 285). Finally, the program would be implementing ABA methodology and discreet trial training. (Tr. 285, 288-89). In addition to the 8-1-2 program, A.S. would receive 10 hours per week of BIS in the home, parent counseling and training, speech, OT, PT, an updated FBA and BIP, consultation with a BCBA, amongst other services and accommodations. (Tr. 286-87, 291-93; Dist. Ex. 6, 16).

52.     Ultimately, while the majority of the CSE agreed with the recommended 8-1-2

program and believed it would meet A.S.'s unique needs, the parents, Elijah and Dr. Taylor did not; the Parents therefore opted to continue the student's placement at Elijah for the reminder 2022-2023; never did they give the CSE's recommended program an opportunity. (Tr. 286-95).

53.     As noted at length in the record and implemented within the District, the District offered a small, special-class program utilizing principals of ABA, including discrete trial training, a modified academic and life-skills curriculum, whole group, small group, as well as individual instruction, and various other facets of ABA and other methodologies to address students with behavioral concerns and very low academic functioning, including A.S.. This model, oft referred to as an "ABA-based" or "ABA-type" classroom, is used throughout school districts and BOCES in the State, including as relevant here, Plaintiff.

54.     By its decision, however, the SRO has appeared to condemn this approach, finding it insufficient to address the behavioral and academic needs of this student, and other students similarly situated, instead favoring a program, such as the Elijah Program, providing intensive 1:1 ABA instruction from an RBT under the oversight of a BCBA to the exclusion of all else, including academics.

55.     The SRO's analysis, by its decision in striking down the District-offered program, unfortunately ignored significant evidence of the student's slow but steady progress while in attendance in the recommended BOCES program a year earlier, a program much akin to the District's ABA-based offering. Hence, contrary to the SRO's finding, the record was clear that the student could and, in fact did, progress in a program that was not exclusive to the Elijah Model.

56.     The SRO misapprehended the record and the District's efforts to timely convene the CSE prior to the start of the 2022-2023 school year, the parents actions in stymieing those efforts, and thereafter ultimately and erroneously mischaracterized both the student's needs, as

well as the anticipated efficacy of the District's proposed program. (SRO Dec. 17-21). In doing so, the SRO came to the inappropriate conclusion that the CSE's proffered program in September 2022 and the timelines thereof acted to deprive A.S. of a FAPE. (SRO Dec. 21).

57.     Finally, and again, the SRO's determination with respect to the timing of A.S.'s program development in September 2022 deprived A.S. of a FAPE, when viewed under the totality of circumstances presented, represents clear error and must be vacated and reversed.

58.     The District's attempts to convene the CSE and timely develop the student's 2022-2023 IEP were well documented in the record. These consisted of multiple e-mails and telephone contacts with the parents throughout the 2022 Spring and Summer and ultimately, a series of CSE meetings beginning on June 17, 2022 to develop the student's ESY summer program, and later on September 9, 2022, during which the CSE completed the IEP and developed the student's program for the 10-month school year.

59.     By its decision the SRO has strictly construed the general tenet that a complete IEP must be in place for a student by school's end on June 30th. The SRO has ignored, or minimally, provided no weight to the tenant that an ESY program was in place for the student in July, and a 10-month program available in September, that further, that there is no evidence to suggest the student suffered, or would have suffered any educational deprivation by any delay.

60.     Equally provided little, if any, consideration, was the parents conduct where that conduct stymied the CSE's ability to timely meet and complete an IEP. As noted, by its decision, the SRO has ruled that little if any weight will be attributed to such factors, which consequently, were all present here. Instead, the SRO has erroneously ruled that the CSE's ultimate failure to compose a complete IEP prior to June 30, 2022 represents a procedural error that acted to deprive the student of a FAPE.

61.     For the reasons set forth herein, the SRO decision misconstrues the record and applicable review standard, is contrary to the law, and represents clear error.

COUNT II

**THE STATE REVIEW OFFICER ERRONEOUSLY AFFIRMED THE FINDINGS
AND DETERMINATION OF THE IMPARTIAL HEARING OFFICER
IN CONCLUDING THE ELIJAH SCHOOL WAS APPROPRIATE**

62.     Plaintiff reasserts and realleges each and every allegation set forth in paragraphs "1" – "61" as if more fully set forth herein.

63.     It was undeniable that the Elijah School did not provide any academic instruction for the student while in attendance; simply put, there was no academic curriculum and no qualified staff to implement it. The student received 1:1 ABA, all day, by RBTs and similarly certified staff. Equally true, the student did not receive related services, including most prominently speech, or any opportunity to socialize with his peers, disabled or not, which he required to advance as a student. It is equally true, although disregarded, that the student made progress while in the BOCES program and receiving instruction from appropriately trained and certified staff using a modified academic curriculum.

64.     By its decision (SRO Dec. 21-26), the SRO has disregarded the law and its present interpretation and significantly expanded upon the definition of "appropriate placement" as that term is used in the context of a parent's burden to establish the appropriateness of their chosen unilateral placement.

65.     More specifically, the SRO has determined that teaching "pre-academic" skills alone, together with related services through a "consultant model", notwithstanding the specific needs of a student, are sufficient to meet a parent's burden in establishing the appropriateness of a unilateral placement. In so doing, the SRO erroneously recognized the 1:1 ABA program at Elijah

is sufficient to meet the student's needs. What is more, and likewise in error, the SRO also found the indirect provision of related services to non-certificated staff through a consultant model was sufficient to meet the non-public school's related service burden notwithstanding the student's significant deficits in the cited areas and need for 1:1 or small group remediation in those areas.

66.     A unilateral placement is only appropriate if it provides education specifically designed to meet the unique needs of the student. Id. at 115. In considering appropriateness, restrictiveness of the unilateral placement is a relevant factor. DDS v. Southold Union Free Sch. Dist., 2012 WL 6684585 (affirming restrictive unilateral placement was inappropriate). The Parents here have failed to establish that Elijah was an appropriate placement for the Student and the SRO's determination affirming the IHO's decision in this regard represents clear error.

67.     Based on all of the evidence, although the hearing record reflects that Elijah addressed the student's interfering behaviors there is no evidence to suggest the school addressed any of the student's academic deficits or needs, including those in reading, writing, math, nor addressed his needs in speech, occupational or physical therapy through a qualified therapist. Finally, there was no evidence to suggest Elijah addressed the student's social needs and deficits. There was literally no evidence of the student's academic functioning in the classroom or some other evidence pertaining to the academic instruction he received or specialized instruction he should have received; hence the hearing record contains insufficient evidence to show how Elijah addressed the student's academic needs during the 2022-2023 school year.

68.     While the student's complex behavioral challenges understandably took precedence in terms of the evidence presented by the parent, the student also has a variety of academic needs which must be addressed through specialized instruction, which is not reflected evidentiarily in the hearing record. See, e.g., Application of a Student with a Disability, Appeal No. 23-215. Hence,

there was no evidence concerning how or to what extent, if any, A.S. received instruction pertaining to his academic deficits or what strategies were being used to address A.S.'s academic needs during the times he was regulated enough to attend to instruction. See Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 386 (2d Cir. 2014); see also L.Q. v. Northeast Sch. Dist., 932 F. Supp. 2d 467, 490 (S.D.N.Y. 2013); R.S. v. Lakeland Cent. Sch. Dist., 2011 WL 1198458, at *5 (S.D.N.Y. Mar. 30, 2011).

69.    When viewed in its totality, the SRO's determination finding the parents met their burden in establishing the appropriateness of the Elijah School to serve as the student's unilateral placement is in error. (SRO Dec. 26).

70.    For the reasons set forth herein, the SRO decision misconstrues the record and applicable review standard, is contrary to the law, and represents clear error.

## COUNT III

**THE STATE REVIEW OFFICER ERRONEOUSLY AFFIRMED THE FINDINGS AND DETERMINATION OF THE IMPARTIAL HEARING OFFICER IN CONCLUDING THE EQUITIES FAVORED REMBURSEMENT TO THE PARENTS OF THE COSTS ASSOCIATED WITH A.S.'S UNILATERAL PLACEMENT AT THE ELIJAH SCHOOL**

71.    Plaintiff reasserts and realleges each and every allegation set forth in paragraphs "1" – "70" as if more fully set forth herein.

72.    The hearing record demonstrates that the parents' actions during the 2022 Summer in delaying the scheduling of a CSE to complete development of the student's 2022-2023 IEP, along with their May 2022 investigation of placement at Elijah, and ultimately, their contract with Elijah in May 2022 evidences that any professed willingness to consider the District's program is no more than a rouse. The SRO's determination to the contrary is in error. (SRO Dec. 27-28).

73.    At every step of the way, the District obtained all relevant information from all

parties involved with the Student, invited all relevant parties to each CSE meeting to provide their input, and endeavored to recommend an appropriate program and an appropriate level of supports and services to educate and meet the needs of the Student in the least restrictive environment, all with the good faith belief that they could enable the Student to make meaningful progress in the District's program, and that with appropriate recommendations, the Student would attend the District's program. (Dist. Ex. 1-6). The District and CSE have complied with the law at every turn and have sought to collaborate with the Parents in good faith to develop a program for the Student that ensured her success.

74.     Contrary to the SRO's determination, the Parents have acted in bad faith with respect to collaborating with the District on a special education program that, by their actions, they predetermined they were not going to accept. By their actions, as outlined above, and further, in delaying the provision of a neuropsychological evaluation report to the District, both upon which they relied during the underling hearing to advance their position to the detriment of the District, the Parents have engaged the District in bad faith. What is more, by their actions they have deprived the District of the ability to work through a common resolution that could have avoided the instant litigation.

75.     Accordingly, and contrary to the SRO's decision (SRO Dec. 28), the equities favor the District in this instance and as such, the Parents are not entitled to reimbursement/funding for the unilateral placement of the Student at the Elijah School.

76.     For the reasons set forth herein, the SRO decision misconstrues the record and applicable review standard, is contrary to the law, and represents clear error.

77.     For the reasons set forth herein, the SRO decision misconstrues the record and applicable review standard, is contrary to the law, and represents clear error.

## JURY DEMAND

78.     Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants and in favor of Plaintiff as follows:

(A) Assume jurisdiction of this action;

(B) Direct the New York State Department of Education, Office of State Review to produce a certified copy of the administrative record;

(C) Receive the administrative record into evidence, under seal;

(D) Receive additional evidence from Plaintiffs;

(E) Reverse the decision of the New York State of Department of Education, Office of State Review and declare that the District offer A.S. a FAPE for the 2022-2023, school year;

(F) Reverse the decision of the New York State of Department of Education, Office of State Review and declare that A.S.'s placement at the Elijah School was inappropriate and that Defendant's failed to meet their burden as such offer;

(G) Reverse the decision of the New York State of Department of Education, Office of State Review and declare that the equities are in the District's favor and do not support an award of tuition reimbursement;

(H) Reverse the decision of the New York State Department of Education, Office of State Review awarding the Defendant's reimbursement from the District for the costs of A.S.'s placement at the Elijah School during the 2022-2023 school year;

(I) Award such other relief as the Court deems necessary and appropriate.

Dated: May 5, 2025
Farmingdale, New York

Respectfully submitted,

GUERCIO & GUERCIO, LLP
Attorneys for Plaintiff

By: _____
MATTHEW L. MEHNERT
77 Conklin Street
Farmingdale, New York 11735
(516) 694-3000